CR # 03-1725-CBS

**AFFIDAVIT**

I, Joseph M, LeStorti, having been duly sworn, hereby depose and state as follows:

1. I am a Special Agent of the United States Department of State's Diplomatic Security Service ("DSS"), and have been so employed since September 2002. As part of my official duties, I am assigned to investigate persons who have provided or included false information in passport applications and persons who have falsely made or altered passports, visas, permits, border crossing cards and alien registration cards.

2. The information set forth in this affidavit is based upon my investigation as well as information provided by the Bureau of Immigration and Customs Enforcement (ICE), Massachusetts State Police (MSP), Shrewsbury Police Department and other law enforcement officials as set forth below. In submitting this affidavit, however, I have not included each and every fact known to me about the investigation, but only those facts that I believe are sufficient to establish probable cause in support of a criminal complaint and the issuance of arrest warrants charging Neila C. CARNEIRO (born 1969) and Heraclito J. SEGOVIA (born 1949; Social Security number XXX-XX-3670) with the following crimes: fraud and related activity in

-1-

connection with identification documents and information in violation of Title 18, United States Code, section 1028; forgery or false use of a passport in violation of Title 18, United States Code, section 1543; fraud and misuse of visas, permits and other documents in violation of Title 18, United States Code, section 1546; and conspiracy in violation of Title 18, United States Code, section 371.

    3.  This affidavit is also made in support of a warrant to search the premises of Select Financial Insurance Agency, Inc., which is located at 364 Boston Turnpike Road, Suite 1D, Shrewsbury, Massachusetts 01545, further described as a business located on the first floor of a multi-level building, which has a green sign with black lettering in the name Select Financial Insurance Agency clearly marked in the window.  I seek a search warrant for the above described business, because I believe there is sufficient probable cause to establish the presence of physical and documentary evidence, including, but not limited to, computers, computer systems, blank or typewritten counterfeit alien registration cards, blank or typewritten counterfeit social security account number cards, blank or typewritten counterfeit passports, blank, typewritten, counterfeit, or altered visas, blank or typewritten birth certificates, and other blank identification documents, typewriters, typewriter

ribbons and/or cartridges, plastic laminators, plastic laminate, paper cutters, scissors, glue, ink pads, ink pad stamps, notebooks, journals, address books, personal telephone books, customer lists and/or records listing names, dates, numbers, cash payments, cash, and other pertinent equipment and documents pertaining to the possession, production and transfer of counterfeit identification documents, which are the fruits, instruments and evidence of crimes in violation of 18 United States Code, sections 1028, 1543 and 1546.

4. MSP Trooper William Bond has been investigating the issuance of fraudulent drivers' licenses at the Massachusetts Registry of Motor Vehicles (RMV) office in Framingham, Massachusetts and other RMV branch offices for the past several years. Trooper Bond told me that he was aware of wide use of counterfeit U.S. visas, both Borroughs-style (ink stamped) and Machine Readable 2000-style with attached photograph, and foreign passports by Brazilian nationals in their attempts to obtain Massachusetts drivers' licenses. Other documents presented at the RMV have included counterfeit Form I-94s and fake Social Security denial letters.[1] These documents have enabled many Brazilians, who

---

[1] A Form I-94 is an entry/exit document provided by the Department Of Homeland Security, or its predecessor agency, the Immigration and Naturalization Service, to a

have either entered the U.S. illegally or have overstayed their B1/B2 visas, to successfully obtain Massachusetts driver's licenses.  Through source interviews, Trooper Bond was informed that two representatives from the Select Financial Insurance Agency, specifically Neila CARNEIRO and Heraclito SEGOVIA, have provided many Brazilian nationals with false documents and have directly assisted them in the application for and acquisition of Massachusetts drivers' licenses while using these fraudulent identity documents.

5. On August 13, 2003, an ICE confidential informant (henceforth referred to as "CI1") and an ICE special agent working in an undercover capacity (henceforth referred to as the "UCA") both met with CARNEIRO, who provided CI1 with a European Community passport from the Republic of Italy under a fraudulent identity with CI1's photo affixed in the passport.  CARNEIRO then transported both CI1 and the UCA to

---

non-immigrant alien when he or she enters the United States. The Form I-94 and associated visa must be presented together to show the alien's visa classification and specific date of entry into the United States.  The non-immigrant alien must have in his or her possession both a non-immigrant visa and a Form I-94.  A Social Security denial letter is a letter issued by the Social Security Administration to a non-immigrant alien which indicates that the alien is not eligible for work based upon a review of documents presented by the alien to the Social Security Administration.  Because non-work eligibility status does not necessarily mean that an alien is ineligible to obtain a Massachusetts driver's license, the denial letter can be presented as part of a package of documents to the RMV in order to attempt to procure a license.

the Social Security Administration (SSA) Office in Chelsea, Massachusetts and to the Massachusetts Registry of Motor Vehicles (RMV) office in Melrose, Massachusetts and provided CI1 with specific instructions on what to do when CI1 entered each of these offices, in order to obtain a false Social Security card or denial letter and a Massachusetts driver's license using the false documents.  The SSA Office issued CI1 a denial letter.  The UCA and CI1 then traveled to the RMV Office and attempted to procure a Massachusetts Driver's License with the documents provided by CARNEIRO. The license was denied to CI1 because the RMV clerk handling CI1's application flagged it as an instance of fraud.  As this attempt was unsuccessful, CARNEIRO stated she would provide CI1 with another passport in a different identity. CARNEIRO indicated, however, that an individual named "Chico" would eventually contact CI1 and drive CI1 to the RMV, as CARNEIRO would be unavailable.  The negotiated price for CARNEIRO's assistance had been two thousand dollars; CI1 withheld payment, however, as the August 13 attempt was unsuccessful.  Also noted in the European Community passport was a counterfeit Form I-94W form for Visa Waiver visitors. The class of admission reflected on the I-94W was L-2, the non-immigrant visa classification for spouses and children

of certain alien business executives and "special knowledge" employees authorized to work in the United States.

6. On August 15, 2003, a person identifying himself as Chico contacted CI1. A meeting was set at the Select Insurance parking lot. CI1, accompanied by the UCA, subsequently met with "Chico," who was later positively identified by UCA to be Heraclito SEGOVIA, an employee of Select Financial Insurance Agency in Shrewsbury. SEGOVIA provided CI1 with a European Community passport from the Republic of Italy under a different fraudulent identity from the passport received by CI1 on August 13, 2003, with CI1's photo affixed in the passport. SEGOVIA then transported CI1 and the UCA in a vehicle, which was registered to Neila CARNEIRO, to the SSA Office, where CI1 was issued a denial letter, and then to the RMV Office in Lowell, MA. After CI1 was successful in obtaining a learner's permit, the UCA paid SEGOVIA two thousand dollars (as previously agreed) for SEGOVIA and CARNEIRO's assistance.

7. Later on August 15, 2003, SEGOVIA transported the UCA and CI1 back to Select Financial Insurance Agency in Shrewsbury, where the UCA met both SEGOVIA and CARNEIRO. During the meeting, both CARNEIRO and SEGOVIA told the UCA that they were amenable to the idea of having the UCA act as a broker by providing them (CARNEIRO and SEGOVIA) with

-6-

customers' passports and/or identifications. This would enable them (CARNEIRO and SEGOVIA) to create other fraudulent documents, which would be used to acquire Massachusetts drivers' licenses. The UCA would then be responsible for escorting the individuals to the RMV offices and would receive "a cut" of the price paid for the fraudulent documents for the UCA's services as a broker for CARNEIRO and SEGOVIA.

8.  On August 25, 2003, a second ICE CI ("CI2") and the ICE UCA met with CARNEIRO near the RMV Office in Lowell, MA. CARNEIRO provided CI2 with a European Community passport from the Republic of Italy under a fraudulent identity with CI2's photo affixed in the passport. The UCA and CI2 entered the RMV Office and successfully procured a Massachusetts learner's permit while using the documents provided by CARNEIRO. Following this, the UCA paid CARNEIRO one thousand eight hundred dollars for the use of the fraudulent documents and for CARNEIRO's assistance.

9.  On September 5, 2003, the ICE UCA purchased six Resident Alien cards for nine hundred dollars from CARNEIRO and SEGOVIA. The purchase took place inside the office space at Select Financial Insurance Agency in Shrewsbury. The ICE UCA has described the office space as an open area located on the first floor of the multi-level building located at

364 Boston Turnpike Road, Suite 1D, Shrewsbury, Massachusetts 01545. During the purchase, the ICE UCA witnessed the manufacture of the Resident Alien cards by SEGOVIA within the Select Financial Insurance Agency's office. The ICE UCA also observed a Brazilian passport with an old-style Borroughs U.S. visa affixed within. SEGOVIA stated to the UCA that he (SEGOVIA) "was bringing a person to the Registry of Motor Vehicles today and using this document." SEGOVIA stated that he had made the document and that it was a fake visa.

10. Based on my experience as a special agent, I am familiar with the tools, equipment and materials necessary for the manufacture of counterfeit alien registration cards, social security cards, and passports. I am aware that the common types of tools, equipment and materials used in the manufacturing of said documents are a computer, computer printer, computer document scanner, typewriter, plastic laminate, a sealing mechanism, ink pads, blank alien registration cards and blank social security cards.

11. For the purposes of this affidavit, the term "computer" refers to the box that houses the central processing unit ("CPU") along with any internal storage devices such as internal hard drives and internal communication devices (such as internal modems capable of

sending/receiving electronic mail or fax cards, along with any other hardware stored or housed internally. Thus, computer refers to hardware, software, and data contained in the main unit. Printers, external modems (attached by a cable to the main unit), monitors, scanners, and other external attachments will be referred to collectively as peripherals. When the computer and all peripherals are referred to as one package, the term "computer system" is used. Information refers to all the information on a computer system, including both software and applications data.

## NECESSITY OF OFFSITE SEARCH OF COMPUTERS

12. During the course of this and other investigations, I have consulted with computer forensic specialists within the DSS, including DSS Special Agent Kenneth Fisk. Special Agent Fisk has been a Diplomatic Security Service Special Agent for one year, and is currently assigned to the Computer Investigations and Forensics Section, located in the metropolitan Washington, DC area. As such, he has accomplished and overseen the seizures of computer systems and electronic media in support of five prior criminal investigations handled by the DSS. Special Agent Fisk has attended the Computer Investigative Training Program at the Federal Law Enforcement Training

Center located in Glynco, Georgia. This training includes instruction in searching, seizing, and analyzing data from computer systems while maintaining the integrity of the digital evidence. In addition, Special Agent Fisk has received additional in-service training in the area of computer forensics and has participated in the seizure of computers as the forensic expert in the execution of other search warrants.

13. It is evident from the foregoing that Select Financial Insurance Agency, Inc. uses computers to operate its business. Special Agent Fisk has informed me that to properly retrieve and analyze all electronically stored (computer) data, to document and authenticate such data, and to prevent the loss of the data either from accidental or deliberate programmed destruction, requires on-site and laboratory analysis by a qualified computer specialist. To effect such accuracy and completeness requires the seizure of all computer equipment and peripherals, which may be interdependent, the software to operate the computer system, and related instruction manuals which contain directions concerning the operation of the computer system, and the software programs.

14. Special Agent Fisk has advised me that computer storage devices, such as hard disks, diskettes, tapes, and

compact disks, can store the equivalent of thousands of pages of information. As an example, a one hundred megabyte (100MB) hard drive would have the capacity for storing approximately 50,000 pages of typewritten, double-spaced text; however, I have also been advised that the majority of computers currently sold have as a minimum, twenty gigabyte (20000MB) hard drives, or larger, with an equivalent capacity in excess of 10 billion pages of typewritten, double-spaced text.

15. Based upon Special Agent Fisk's experience, when a user wants to conceal criminal evidence, he/she often stores it in random order with deceptive file names. This requires the agents conducting the search to examine all the stored data to determine which particular files are relevant and fall within the scope of the warrant. This search process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on-site.

16. With respect to this latter part of the search, the analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the

individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

17. Special Agent Fisk has further advised me that searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment, and that data search protocols are exacting procedures designed to protect the integrity of the evidence, and to recover even "hidden", erased, compressed, password protected, or encrypted files. Special Agent Fisk states that many commercial computer software programs also save data in unique formats which are not conducive to standard data searches. Some programs that he has encountered create temporary "print files" for the

generation of hard-copy printouts then automatically deletes them after a time set by the computer user; the remaining data is then compressed into a format that is not viewable with standard utility software programs.

18. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive codes imbedded in the system as a "booby trap"), a controlled environment is essential to a complete and accurate analysis. In order to fully retrieve data from a computer system, the analyst needs to seize all magnetic storage devices, as well as the centralized processing units (CPU's) in order to search them in a laboratory or controlled environment.

19. To the extent practical, if persons claiming an interest in seized computers so request, I will make available to those individuals "bit by bit" or "cloned" copies of the computer(s) hard-drives within a reasonable time after the execution of the search warrant to minimize any impact that said seizures may have on their personal and/or business operations. If after inspecting the computer system, including all input-output devices, system software, and instruction manuals, a computer specialist determines that these items are no longer necessary to

retrieve and preserve the data evidence, I will return them as soon as practicable.

20. Based on the foregoing, I believe that there is probable cause to believe that physical and documentary evidence, including to, but not limited to, computers, computer systems, blank and or type written counterfeit alien registration cards, blank and or type written Social Security cards, blank international driver's licenses, and any other blank identification documents, typewriters, typewriter ribbons and/or cartridges, plastic laminators, plastic laminate, paper cutters, scissors, glue, ink pads, notebooks, journals, address books, personal telephone books, customer lists and/or records listing names, dates, numbers, cash payments, cash and other pertinent equipment pertaining to the possession, production and transfer of counterfeit identification documents, which are the fruits, instrumentalities and evidence of crimes in violation of Title 18, United States Code, sections 1028, 1543 and 1546, are located at the premises of Select Financial Insurance Agency, Inc., which is located at 364 Boston Turnpike Road, Suite 1D, Shrewsbury, Massachusetts 01545.

21. Based on the preceding information, I further believe that probable cause exists that Nelia CARNEIRO and Heraclito SEGOVIA did, on or about August 13, 15, 25, 2003,

and on or about September 5, 2003, knowingly and without lawful authority, produce and transfer false identification documents in violation of Title 18, United States Code, section 1028(a); and did knowingly engage in forgery and false use of a passport in violation of Title 18, United States code, section 1543; and did knowingly produce counterfeit visas and alien registration documents in violation of Title 18, United States Code section 1546; and did conspire to commit the aforementioned acts and committed overt acts in furtherance of that conspiracy, in violation of Title 18, United States Code, section 371.

_____
Joseph M LeStorti
Special Agent
Diplomatic Security Service
U.S. Department of State

Sworn and subscribed to me this 9th day of September 2003.

_____
CHARLES B. SWARTWOOD, III
U.S. MAGISTRATE JUDGE