```
                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
_____
                              )
UNITED STATES OF AMERICA      )
                              )
v.                            )    Criminal No.  04-40001-NMG
                              )
HERACLITO SEGOVIA, a/k/a      )
                              )
     "CHICO"                  )
_____)
```

## JOINT SENTENCING MEMORANDUM
### (DRAFT)

**I. REQUEST TO WAIVE PRESENTENCE INVESTIGATION AND REPORT**

The parties jointly request, pursuant to Fed. R. Crim. P. 32(b)(1), that the presentence investigation and report in this matter be waived, and that Defendant Heraclito Segovia be sentenced on March 4, 2004, or on the earliest later date convenient to the Court's schedule.  As grounds therefor, the parties suggest that the information in the record before this Court enables it to exercise its sentencing authority meaningfully under 18 U.S.C. §3553.  In support of their joint request, the parties provide the Court with a stipulation of the offense conduct of Defendant supporting the four-count Information to which Defendant is prepared to plead.

Count I charges Defendant with conspiracy to commit fraud and related activity in connection with identification documents and information in violation of Title 18, United States Code, section 371.  Count II charges Defendant as aiding and abetting fraud and related activity in connection with identification

-1-

documents and information in violation of Title 18, United States Code, sections 1028(a)(3) and 2; Count III charges Defendant as aiding and abetting forgery or false use of passports in violation of Title 18, United States Code, sections 1543 and 2; and Count IV charges Defendant as aiding and abetting fraud and misuse of visas, permits and other documents in violation of Title 18, United States Code, sections 1546(a) and 2.

The parties inform the Court that, should the Court accept the Defendant's plea to the Information and thereafter sentence him, the likelihood of post-sentencing supervision of Defendant by the United States Probation Office is slight.  Defendant has a detainer lodged against him by United States Immigration and Customs Enforcement ("ICE") as of September 10, 2003.

It is expected that Defendant will be deported shortly after his transfer from the custody of the Attorney General following any further term of imprisonment, to the custody of Immigration and Customs Enforcement Deportation and Removal Unit.

## II.  BIOGRAPHICAL INFORMATION[1]

Defendant was born Heraclito Januario Segovia in Victoria, Espirito Santo, Brazil, on July 21, 1949.  He is the eldest son of the union of Affonso Segovia, deceased since 1979, and Maria Januario Segovia (nee DosSantos).  Defendant maintains a

---

[1] The information contained within this Biographical summary has been verified by Defendant's sister, Neaires Singh.

residence at Rua Jose Marcelino 77, Apt. 502, Cidade Alta Marconi, Victoria, Espirito Santo, Brazil. He has three sisters, Maricilvia Segovia Barbosa (age 52), Silmaria Januaria Segovia (age 50), and Neaires Singh (age 47), and two brothers, Francisco Segovia Neto (age 46) and Hercules Henrique Segovia (age 36). Other than Ms. Singh, all his siblings reside in Brazil. Defendant has one son, Yan Segovia (age 12), living in Victoria, Espirito Santo, Brazil with his mother, to whom Defendant was never married. Until his arrest on the present charge, Defendant provided child support for his son.

According to Defendant, he has an engineering degree, which he earned in approximately 1976 in Brazil. He first visited the United States in approximately 1978, when he stopped in Los Angeles, California en route to a trip to Tokyo, Japan. Defendant returned to the United States through New York on a B-2 visitor for business visa in October 1994. Defendant thereafter moved to Massachusetts. On March 2, 1995, he married Zelia Martins, a United States citizen, and was granted conditional resident alien status and work authorization on October 23, 1995. The couple has since separated, although no divorce decree has entered. In approximately 2001, Defendant began working at Select Financial Insurance Company at 364 Boston Turnpike Road, Shrewsbury, Massachusetts. He obtained an insurance broker's license in Massachusetts in 2002. It was through his employment

at Select Financial Insurance Company that Defendant and Neila Carneiro met Reinaldo Silva, who maintained insurance contracts with that agency, including one or more contracts under the false name John Broy.

Prior to his arrest, Defendant resided at a rented apartment located at 36 Gibbs Road, Apt. 7, Worcester, Massachusetts which he shared with his sister, Neaires Singh and her daughters, Jessica and Jennifer.

Defendant reports that he is in good mental and physical health. He reports no alcohol or controlled substance use, and is not taking any prescribed medication. It is not believed that he poses a danger to the community. Defendant reports no assets in the United States.

**III. GOVERNMENT'S STATEMENT OF RELEVANT FACTS (STIPULATED)**

Massachusetts State Trooper William Bond has been investigating the issuance of fraudulent drivers' licenses at the Massachusetts Registry of Motor Vehicles (RMV) office in Framingham, Massachusetts and other RMV branch offices for the past several years. Trooper Bond informed Special Agent Joseph Lestorti of the Bureau of Diplomatic Security, an agency within the United States Department of State, that he was aware of wide use of counterfeit U.S. visas, both Borroughs-style (ink stamped) and Machine Readable 2000-style with attached photograph, and foreign passports by Brazilian nationals in their attempts to

obtain Massachusetts drivers' licenses.  Other documents presented at the RMV have included counterfeit Form I-94s and fake Social Security denial letters.  These documents have enabled many Brazilians, who have either entered the U.S. illegally or have overstayed their B1/B2 visas, to successfully obtain Massachusetts driver's licenses.

Through source interviews, Trooper Bond was informed that two representatives from the Select Financial Insurance Agency, specifically Defendant Heraclito Segovia and Neila Carneiro (previously sentenced by this Court in <u>United States v. Neila Carneiro</u>, Crim, No. 03-40033-NMG), were providing many Brazilian nationals with false documents and had directly assisted them in the application for and acquisition of Massachusetts drivers' licenses while using these fraudulent identity documents.

On August 13, 2003, an ICE confidential informant ("CI1") and an ICE special agent working in an undercover capacity (the "UCA") both met with Carneiro and Defendant, who provided CI1 with a European Community passport from the Republic of Italy under a fraudulent identity with CI1's photo affixed in the passport.  Carneiro then transported both CI1 and the UCA to the Social Security Administration (SSA) Office in Chelsea, Massachusetts and to the Massachusetts Registry of Motor Vehicles (RMV) office in Melrose, Massachusetts and provided CI1 with specific instructions on what to do when CI1 entered each of

these offices, in order to obtain a false Social Security card or denial letter and a Massachusetts driver's license using the false documents.  The SSA Office issued CI1 a denial letter.  The UCA and CI1 then traveled to the RMV Office and attempted to procure a Massachusetts Driver's License with the documents provided by Carneiro.  The license was denied to CI1 because the RMV clerk handling CI1's application flagged it as an instance of fraud.  As this attempt was unsuccessful, Carneiro stated she would provide CI1 with another passport in a different identity.  Carneiro indicated, however, that an individual named "Chico" would eventually contact CI1 and drive CI1 to the RMV, as Carneiro would be unavailable.  The negotiated price for Carneiro's assistance had been two thousand dollars; CI1 withheld payment, however, as the August 13 attempt was unsuccessful.  Also noted in the European Community passport was a counterfeit Form I-94W form for Visa Waiver visitors.  The class of admission reflected on the I-94W was L-2, the non-immigrant visa classification for spouses and children of certain alien business executives and "special knowledge" employees authorized to work in the United States.

On August 15, 2003, a person identifying himself as Chico contacted CI1.  A meeting was set at the Select Insurance parking lot.  CI1, accompanied by the UCA, subsequently met with "Chico," who was later positively identified by UCA to be Defendant.

-6-

Defendant provided CI1 with a European Community passport from the Republic of Italy under a different fraudulent identity from the passport received by CI1 on August 13, 2003, with CI1's photo affixed in the passport.  Defendant then transported CI1 and the UCA in a vehicle, which was registered to Neila Carneiro, to the SSA Office, where CI1 was issued a denial letter, and then to the RMV Office in Lowell, MA.  After CI1 was successful in obtaining a learner's permit, the UCA paid Defendant two thousand dollars (as previously agreed) for Defendant and Carneiro's assistance.

Later on August 15, 2003, Defendant transported the UCA and CI1 back to Select Financial Insurance Agency in Shrewsbury, where the UCA met both Defendant and Carneiro.  During the meeting, both Carneiro and Defendant told the UCA that they were amenable to the idea of having the UCA act as a broker by providing them (Carneiro and Defendant) with customers' passports and/or identifications.  This would enable them (Carneiro and Defendant) to create other fraudulent documents, which would be used to acquire Massachusetts drivers' licenses.  The UCA would then be responsible for escorting the individuals to the RMV offices and would receive "a cut" of the price paid for the fraudulent documents for the UCA's services as a broker for Carneiro and Defendant.

On August 25, 2003, a second ICE Confidential Informant ("CI2") and the ICE UCA met with Carneiro near the RMV Office in

Lowell, MA.  Carneiro provided CI2 with a European Community passport from the Republic of Italy under a fraudulent identity with CI2's photo affixed in the passport.  The UCA and CI2 entered the RMV Office and successfully procured a Massachusetts learner's permit while using the documents provided by Carneiro.  Following this, the UCA paid Carneiro one thousand eight hundred dollars for the use of the fraudulent documents and for Carneiro's assistance.

On September 5, 2003, the ICE UCA purchased six Resident Alien cards for nine hundred dollars from Carneiro and Defendant.  The purchase took place inside the office space at Select Financial Insurance Agency in Shrewsbury.  During the purchase, the ICE UCA witnessed the manufacture of the Resident Alien cards by Defendant within the Select Financial Insurance Agency's office.  The ICE UCA also observed a Brazilian passport with an old-style Borroughs U.S. visa affixed within. Defendant stated to the UCA that he (Defendant) "was bringing a person to the Registry of Motor Vehicles today and using this document."  Defendant stated that he had made the document and that it was a fake visa.

On September 10, 2003, searches made at the time of Carneiro's and Defendant's arrests resulted in the recovery of: three false European Community passports purportedly issued by the Republic of Italy; one false Brazilian passport; six United

States Resident Alien cards; three counterfeit Form I-94W forms contained within the three false European Community passports purportedly issued by the Republic of Italy; and one counterfeit United States visa contained within the false Brazilian passport.

The government adds that, like Carneiro, Defendant was principally responsible for providing the documents to undocumented aliens and acting as "runners" to bring those undocumented aliens to the SSA offices and to RMV facilities. Accordingly, it regards Defendant as a minor participant. The government notes, however, that on one occasion, Defendant claimed to have actually produced a document. In any event, the evidence known to the government indicates that the majority of the documents were produced by either Reinaldo Silva, or by Abraao A. Oliveira and Eder D. Coelho, and that Silva, and in some instances Oliveira and Coelho, retained the bulk of the proceeds from the fraudulent transactions.

**IV.   GUIDELINE CALCULATIONS**

    **A.   <u>Base Offense Level</u>**

U.S.S.G. §2L2.1 is the applicable guideline provision for the case, because the gravamen of the offenses is that of trafficking in illegal immigration documents. That guideline provides for an initial base offense level ("BOL") of 11. Between 6-24 documents were involved, so the base offense level is increased by three levels to Level 14, pursuant to U.S.S.G.

§2L2.1(b)(2)(A). The parties agree that Defendant had a minor role in the offense conduct, and that his Total Offense Level should be reduced by two levels to Level 12, pursuant to U.S.S.G. §3B1.2(b). Defendant is entitled to a two-level reduction of his BOL under U.S.S.G. §3E1.1(a) to reflect his timely acceptance of responsibility. Accordingly, the parties agree that Defendant's adjusted Offense Level is 10.

### B. Criminal History

The U.S. Probation Office has determined that Defendant is in Criminal History Category II. Specifically, on February 17, 1998, Defendant was arraigned in the Worcester Superior Court on a charge of leaving the scene of an accident in which a person was injured in violation of M.G.L. ch. 90, § 24(2)(a1/2)(1). Commonwealth v. Segovia, Crim. No. 9803111. Having been found guilty, the judgment was subsequently reversed. On January 13, 2004, Defendant pled guilty to the same charge and received an eleven-month sentence, time having previously been served. Accordingly, that case is assigned 2 criminal history points pursuant to Guidelines 4A1.1(b), 4A1.2(b)(1) and 4A1.2(e)(2), resulting in a Criminal History Categoy of II. Defendant has no other criminal history.

### C. Guideline Sentencing Range and Recommendation

According to the parties' agreement, Defendant's guideline sentencing range is 8-14 months (Zone C). The joint

recommendation of the parties is that the Court sentence Defendant to a period in the custody of the Attorney General at the low-end of the applicable guideline sentencing range. Eight months will elapse on May 9, 2004. Should the Court determine, contrary to the parties' joint recommendation, that Defendant did not play a minor role in the criminal activity for purposes of U.S.S.G. §3B1.2(b), Defendant's adjusted Offense Level would be 12, which calls for incarceration for 12-18 months (Zone D). In that case, joint recommendation of the parties is that the Court sentence Defendant to a period in the custody of the Attorney General at the low-end of the applicable guideline sentencing range. In either case, the parties further recommend that such period of incarceration be followed by three years supervised release, no fine, and a $100 special assessment.

| Respectfully submitted, | Respectfully submitted, |
|---|---|
| HERACLITO SEGOVIA<br>By his attorney, | MICHAEL J. SULLIVAN<br>United States Attorney |
| /s/ John H. LaChance, Esq.<br>JOHN H. LACHANCE, ESQ.<br>600 Worcester Road<br>Framingham, MA 01702<br>508-879-5730 | /s/ Gregory Moffatt<br>GREGORY MOFFATT<br>Assistant U.S. Attorney<br>617-748-3370 |

DATE: March 1, 2004